# RECORD NO. 16-7124

## In The
# United States Court of Appeals
### For The District of Columbia Circuit

## PAUL D. CASEY, Individually and as administrator of the Estate of Patrick D. Casey; ABIGAIL O. CASEY,

*Plaintiffs – Appellants*,

## v.

## MCDONALD'S CORPORATION; KYUNG RHEE, doing business as Rhee's McDonalds; 19TH & K INC., doing business as Ozio; R A H OF WASHINGTON, D.C., INC., doing business as Camelot; JOHN DOES 1-10, Being the ficticious names of persons who are not presently known to Plaintiff; ABC CORPORATIONS 1-10, Being ficticious entities who are not presently known to Plaintiff,

*Defendants – Appellees*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

### APPELLEES' SUPPLEMENTAL APPENDIX

---

Joseph J. Bottiglieri (No. 41823)
Michael L. Pivor (No. 933473)
Andrew Butz (No. 500911)
BONNER KIERNAN
 TREBACH & CROCIATA LLP
1233 20th Street, N.W., Suite 800
Washington, D.C. 20036
(202) 712-7000

*Counsel for Appellees*
*McDonald's Corporation*
*and Kyung Rhee*

# TABLE OF CONTENTS

Appendix Page

Defendant McDonald's Corporation's
Statement of Undisputed Material Facts Supporting Its
Motion for Summary Judgment
on February 3, 2016......................................................................................1

Defendant Rhee's McDonald's'
Statement of Undisputed Material Facts Supporting Its
Motion for Summary Judgment
filed February 3, 2016................................................................................. 6

Defendant Kyung Rhee d/b/a McDonald's
Supplemental Statement of Undisputed Material Facts in
Support of Its Reply to Plaintiffs' Opposition to this
Defendant's Motion for Summary Judgment
filed March 8, 2016.................................................................................... 25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAUL D. CASEY, et al. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:13-cv-1452 |
| v. | ) | |
| | ) | |
| JASON WARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT McDONALD'S CORPORATION'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING
## ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant McDonald's Corporation (hereinafter "McDonald's Corporation"), by and through counsel, BONNER KIERNAN TREBACH & CROCIATA, LLP, pursuant to Fed. R. Civ. Proc. 56 and respectfully submits this statement of undisputed material facts in support of its Motion for Summary Judgment.

## UNDISPUTED MATERIAL FACTS

To distinguish key material facts for this Motion by Defendant McDonald's from the key material facts for the Motion by Defendant Rhee's McDonald's, this Statement uses letters rather than numbers.

(A)     Defendant McDonald's entered into a Franchise Agreement with Defendant Rhee's McDonald's on May 22, 1995, a true and correct copy of which is attached as Exhibit A hereto.  (*See* Warfield Dep., at 10-12, & Ex. A hereto.)

(B)     Under the express terms of Paragraph 16 of the Franchise Agreement, entitled *Franchisee Not an Agent of McDonald's*, franchisee Rhee's McDonald's lacks any authority,

express or implied, to act as agent of franchisor McDonald's or any of its affiliates for any purpose. Instead, franchisee Rhee's McDonald's is an independent contractor responsible for all the obligations and liabilities of, and for all loss and damage to, the Restaurant and its business, including "all claims or demands based on . . . injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant." (Franchise Agreement, ¶ 16.)

(C)     Under the express terms of Paragraph 24 of the Franchise Agreement, entitled *Indemnification*, franchisee Rhee's McDonald's agreed to indemnify, defend and hold Defendant McDonald's harmless from any claim or suit by reason of any claimed act or omission by franchisee, his employees or agents, or by reason of any act occurring on the restaurant premises, or by reason of an omission with respect to the business or operation of the restaurant. (Franchise Agreement, ¶ 24.)

(D)     Defendant McDonald's leased the restaurant premises at 1916 M Street N.W. to franchisee Rhee's McDonald's in a May 22, 1995 Operator's Lease attached as Exhibit A to the 1995 Franchise Agreement, a true and correct copy of which is also included in Exhibit A hereto. (*See* Operator's Lease.)

(E)     Under the express terms of Section 8.01 of the Operator's Lease, entitled *No Agency Created*, franchisee Rhee's McDonald's lacks any authority, express or implied, to act as agent of landlord McDonald's or any of its affiliates for any purpose. Instead, tenant Rhee's McDonald's is an independent contractor responsible for all the obligations and liabilities of, and for all loss and damage to, the premises, and for any "all claims or demands based on . . . injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the McDonald's Restaurant located on the Premises." (*See* Operator's Lease, § 8.01.)

(F)     Under the express terms of Section 7.2 of the Operator's Lease, entitled *Indemnification for Litigation*, franchisee Rhee's McDonald's agreed to indemnify, defend and hold Defendant McDonald's harmless from any claim or suit by reason of any act occurring on the premises, or by reason of an omission with respect to the business or operation of the McDonald's restaurant.  (*See* Operator's Lease, § 7.2.)

(G)     Effective January 1, 2005, Defendant McDonald's entered into an agreement with its subsidiary McDonald's USA, LLC entitled McDonald's USA, LLC Master Assignment and Assumption of Franchises (the "Master Assignment"), a true and correct copy of which is Exhibit B hereto.  (*See* Warfield Dep., at 10-12.)

(H)     Under the terms of Paragraph 1 of the Master Assignment, entitled *Assignment*, McDonald's assigned and transferred to McDonald's USA, LLC all right, title and interest in Franchises and Ancillary Agreements involving franchises within the United States and its territories, exception certain listed franchise locations not relevant here.   (*See* Master Assignment, ¶ 1.)

(I)     Under the terms of Paragraph 2 of the Master Assignment, entitled *Assumption*, McDonald's USA, LLC accepted the foregoing Assignment and assumed all of the obligations of Assignor under the Franchises and Ancillary Agreements involving franchises within the United States and its territories, with the same listed exceptions not relevant here.  (*See* Master Assignment, ¶ 2.)

(J)     Since January 1, 2005, McDonald's USA, LLC has in fact exercised all right, title and interest in the Franchise Agreement and Operator's Lease for the franchisee located at 1916 M Street, N.W.  (*See* Warfield Dep., at 19-20.)

(K)     Since January 1, 2005, Defendant Rhee's McDonald's has been required to look

exclusively to McDonald's USA, LLC as its franchisor and landlord. (*See id.*)

(L)     Under the terms of the Franchise Agreement and Operator's Lease, as implemented since January 1, 2005 through the Master Assignment, the franchisee is required to adopt and follow certain policies and practices in the McDonald's corporate Operations and Training Manual, but not others. (*See* Warfield Dep., at 38-39 & 67; Webb Dep. at 21-22.)

(M)     In particular, defendant McDonald's Corporation and its subsidiary McDonald's US, LLC do not have policies and procedures regarding security that are imposed upon independent franchisees, which are entitled to establish and follow their own security policies and practices. (*See* Webb Dep., at 21-22, 36-38 & 44-45.)

(N)     As a result, under the terms of the Franchise Agreements and Operator's Leases, if a franchisee-owned restaurant lacks adequate security, it is the franchisee's responsibility. (Webb Dep., at 45-46.)

(O)     McDonald's maintains and promulgates a document entitled U.S. Operations and Training Manual, including certain security-related provisions, which applies to McDonald's - owned restaurants but not to franchisee restaurants.  (Webb Dep., at 47-51.)

(P)     Even in the event that a customer was seriously injured or died in a restaurant that is franchise owned, Defendant McDonald's and its security-related employees have no contractual authority to require such a franchisee to comply with or change the franchisee's independently established security policies and practices. (*See* Webb Dep., at 85.)

*          *          *

Dated this 3rd day of February 2016.

BONNER KIERNAN TREBACH & CROCIATA, LLP

/s/ Michael L. Pivor

Joseph J. Bottiglieri, Esquire #418523
Michael L. Pivor, Esquire #500911
1233 20th Street, N.W.
Suite 800
Washington, D.C. 20036
(202) 712-7000
(202) 712-7100 Fax
jbottiglieri@bonnerkiernan.com
mpivor@bonnerkiernan.com
*Counsel for Defendant McDonald's Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAUL D. CASEY, et al. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:13-cv-1452 |
| v. | ) | |
| | ) | |
| JASON WARD, et al. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT KYUNG RHEE d/b/a RHEE'S McDONALD'S'
STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING
ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Kyung Rhee d/b/a Rhee's McDonald's (hereinafter "Defendant Rhee's McDonald's"), by and through counsel, BONNER KIERNAN TREBACH & CROCIATA, LLP, pursuant to Fed. R. Civ. Proc. 56 and respectfully submits this statement of undisputed material facts in support of its Motion for Summary Judgment.

**UNDISPUTED MATERIAL FACTS**

A.    **The Key Undisputed Material Facts**

There are only a few key material facts concerning Plaintiffs' remaining negligence-based survival action, and none of them are genuinely in dispute:

(1)    Plaintiffs have cited only 10 incidents inside or near the restaurant during the preceding 26 months, and the only recent incident even arguably similar in time (early morning after midnight), place (violence within the restaurant) and context (two 20-to-25-year-old white males harassing and then punching a group comprising one male and two females aged 26-27) began with the male suspects teasing the females and escalated only when their male companion

1

intervened, and neither group was noticeably intoxicated. (*See* Section B.1, *infra* (describing and classifying each incident).)

(2)    At about 1:13 a.m., Patrick Casey's friends David Lindsey and Clare Jun arrived at the restaurant, got in line, placed their food order, waited for their food, met up with Casey while waiting for the food, received their food, and sat down with Casey in the front half of the restaurant about 14 minutes later and began eating, without noticeable incident or encounter with Defendants Ward, Ruark or Giblin, even though Patrick Casey reportedly was loud and boisterous. (*See* Section B.2.a, *infra*, including time line between 1:13:03 a.m. and 1:27:25 a.m.; Section B.2.b, *infra*, ¶¶ a, b, 3, f, g & k.)

(3)    At about 1:16 a.m. while Lindsey and Jun were in line several places ahead, Defendants Jason Ward, Justin Ruark and Brian Giblin arrived, got in line, ordered food, waited for their food and took their food, and sat down at the very front of the restaurant. About 20 minutes later, they began eating, without any encounter with the Casey group or any notable incident, except that Ward and Giblin spent about 2 minutes "horsing around" with each other while Ruark stood by in line before they placed their food order. (*See* Section B.2.a, *infra*, including time line between 1:15:50 a.m. and 1:35:24 a.m.; Section B.2.b, *infra*, ¶¶ c, d, h, i, j & k.)

(4)    After a few minutes of banter on "male topics" between the two, nearby tables, Patrick Casey got up at 1:41:34 and walked over to the other group's store-front table, and Justin Ruark immediately stood up and faced Casey. (*See* Section B.2.a, *infra*, including time line between 1:41:29 a.m. and 1:41:57 a.m.; Section B.2.b, *infra*, ¶¶ m, n & o.)

(5)    Casey's approach to the other table and the ensuing conversation was provoked at least in part by some provocative remark the Ward table's occupants directed at his table, but

2

there may also have been provocative remarks from Casey or David Lindsey about the Ward table's occupants. (*See* Section B.2.a, *infra*, including time line between 1:35:24 a.m. and 1:41:37 a.m.; Section B.2.b, *infra*, ¶¶ m & n.)

(6)     About 40-45 seconds later, David Lindsey got up and walked over to the Ward table, made a gay-slur remark to its occupants, and then headed toward the restaurant's nearby front door, as Casey backed away in the same direction. (*See* Section B.2.a, *infra*, including time line between 1:42:22 a.m. and 1:42:34 a.m.; Section B.2.b, *infra*, ¶¶ p, q, r & u.)

(7)     In response to Lindsey's gay-slur remark, Brian Giblin stood up at about 1:42:42, approached Lindsey with his hands out. (*See* Section B.2.a, *infra*, including time line between 1:42:22 a.m. and 1:42:43 a.m.; Section B.2.b, *infra*, ¶¶ s & t.)

(8)     During the next 20 seconds after Giblin stood up, Lindsey tried to go to the door, Giblin tried to follow him, Casey at first stood in the way, then turned and went toward the door, followed by Ward and then Ruark, during which movement Casey made a remark to the other group about "taking it outside" and "kicking all your asses." (*See* Section B.2.a, *infra*, including time line between 1:42:43 a.m. and 1:42:52 a.m.; Section B.2.b, *infra*, ¶¶ s, t, u, v, w & x.)

(9)     During this same 20 seconds, voices are raised and there is pushing and shoving at the door, but within the next 30 seconds Lindsey, Giblin, Casey and Ward have all exited to the immediately adjacent sidewalk through the glass double doors of the restaurant. (*See* Section B.2.a, *infra*, including time line between 1:42:43 a.m. and 1:43:04 a.m.; Section B.2.b, *infra*, ¶¶ x, y z, aa, bb & cc.)

(10)     At the end of the same 20 seconds, having reached the sidewalk, Casey grabbed Giblin, spun him around, and threw him to the ground. (*See* Section B.2.a, *infra*, including time line between 1:42:52 a.m. and 1:43:16 a.m.; Section B.2.b, *infra*, ¶¶ cc, dd & ee.)

(11)   A few seconds later, to protect Giblin, Jason Ward cocks his arm and punches Casey while Casey is still focused on Giblin, knocking Casey backwards away from the restaurant door and causing him to fall to the ground, striking the back of his head on the sidewalk. (*See* Section B.2.a, *infra*, including time line between 1:42:52 a.m. and 1:43:16 a.m.; Section B.2.b, *infra*, ¶¶ ff & gg.)

(12)   After being thrown to the ground by Casey, Giblin immediately got up and began running down the street. Ward re-entered the restaurant briefly to summon Ruark, and those two followed Giblin down the street. (*See* Section B.2.a, *infra*, including time line between 1:42:52 a.m. and 1:43:30 a.m.; Section B.2.b, *infra*, ¶ hh.)

(13)   Realizing that Casey was badly hurt, Lindsey called 911. (*See* Section B.2.a, *infra*, including time line between 1:43:04 a.m. and 1:43:30 a.m.; Section B.2.b, *infra*, ¶ hh.)

(14)   Police officers in the area began arriving, and the reported response time was about 73 seconds, not including the time for Lindsey's call to be placed and connected. Section B. 2.b, *infra*, ¶ tt.)

(15)   Defendants Ward and Giblin engaged in "horsing around" during the last few minutes they waited in line to order food at the restaurant, smiling and laughing while Defendant Ruark looked on. (*See* Section B.2.a, *infra*, including time line between 1:27:05 a.m. and 1:29:20 a.m.; Section B.2.b, *infra*, ¶¶ h & i.)

(16)   There is no evidence that the restaurant manager saw the horsing around while waiting to order food, asked Ward and Giblin to leave the restaurant, or called the police. (*See* Section B.2.a, *infra*, including time line between 1:27:05 a.m. and 1:29:20 a.m.; **Ex. D hereto**, Martinez Aff., *passim*.)

(17)   There is no evidence that the situation would have led to blows solely because of

4

anything provocative that the groups said to each other before Patrick Casey got up and approached Ward's group. (Section B.2.b, *infra*, ¶¶ k, m & n.)

(18)   After Lindsey's gay-slur remark, the situation further escalated toward blows because Patrick Casey suggested to the occupants of the other table that they "take it outside" and stated that he would "kick all your asses." (*See* Section B.2.a, *infra*, including time line between 1:42:22 a.m. and 1:42:52 a.m.; Section B.2.b, *infra*, ¶¶ r, s, t, u & v.)

(19)   From that point forward, the whole incident occurred so quickly – in less than 20 seconds – and at the front doors of the restaurant, that neither a required call to the police nor the presence of a security guard somewhere in the restaurant would have prevented Patrick Casey and the others from "taking it outside" and continuing the physical confrontation on the sidewalk where Casey had just said he would "kick all your asses." (*See* Section B.2.a, *infra*, including time line between 1:42:43 a.m. and 1:43:04 a.m.; Section B.2.b, *infra*, ¶¶ w, x, y, z, aa, bb, cc, dd, ee, ff & gg.)

(20)   Max Podlone, the only customer not involved in the confrontation who tried to reach the front of the restaurant in time to consider intervening in the confrontation arrived too late to prevent Ward from punching Casey after Casey grabbed Giblin. (*See* Section B.2.a, *infra*, including time line between 1:42:48 a.m. and 1:43:30 a.m.; Ex. C hereto, Podlone Aff., at 6-10.)

(21)   The restaurant's shift manager, Jose Martinez, overheard the latter part of the confrontation at the front of the restaurant, but there is no evidence that he or any other restaurant worker was aware of anything before the last 20 seconds preceding the fight outside. (*See* Section B.2.a, *infra*, including time line between 1:42:48 a.m. and 1:43:30 a.m.; Section B.2.b, *infra*, ¶ nn.)

(22)   Martinez did not call the police when he first realized there was a confrontation

between customers just before Casey was punched and injured outside the restaurant, but it would be sheer speculation to assume that the police could have arrived in time to stop the confrontation before Casey was injured. (*See* Section B.2.a, *infra*, including time line between 1:42:48 a.m. and 1:43:30 a.m.; Section B.2.b, *infra*, ¶¶ nn & tt.)

(23)    There is no evidence that Ward would have punched Casey if Casey had not first grabbed and thrown Giblin, and there is no evidence that Giblin struck Casey first. (*See* Section B.2.a, *infra*, including time line between 1:42:48 a.m. and 1:43:30 a.m.; Section B.2.b, *infra*, ¶¶ dd & gg.)

(24)    There is no evidence that anyone in the restaurant complained to the restaurant manager or otherwise feared for their safety at any time. (*See* Section B.2.a, *infra*, including time line between 1:13:03 a.m. and 1:43:30 a.m.; Section B.2.b, *infra*, ¶¶ j, k & kk.)

**B.    Factual Basis for Undisputed Material Facts**

**1.    The Recent History of Potentially Similar Injurious Incidents**

During discovery, Plaintiffs' counsel presented police reports and elicited testimony regarding the six diverse incidents that occurred in or near Defendant Rhee's McDonald's restaurant during the preceding 26 months, and presented an affidavit regarding four other diverse incidents in the latter part of 2009. Those 10 incidents are summarized below, with the few arguable similarities are highlighted in **boldface** and the most significant differences highlighted in ***bold italics***.

| <u>Date/Time</u> | <u>Location and Nature of Incident</u> |
|---|---|
| **Early Sunday Morning**<br>August 16, 2009<br>**(2:00 a.m.)** | After "a couple of minutes" of shouting and cursing between a ***black male and black female*** who were **intoxicated**, the woman repeatedly hit the man, and then, "[w]hen the man walked around the corner before he exited the McDonald's, *he took it . . . his right hand, and placed it around the woman's neck, and threw her to the ground,*" and then left the restaurant, after which the woman |

6

picked herself up and followed the man out of the restaurant. (Ekpenyong Dep., at 50-51 & 131-33, & Ex. 1 thereto, Ekpenyong Aff., ¶¶ 2-7.)   According to the witness, someone from the restaurant called the police. (Ekpenyong Dep., at 69-71.)   *This is apparently a "domestic" dispute, with no other customers physically involved, and the choke-slam occurred just seconds before the man exited.*

| | |
|---|---|
| **Early Sunday Morning**<br>October 25, 2009<br>(4:00 a.m.) | While the restaurant had few customers and was relatively quiet, an **intoxicated** customer had a mild verbal exchange with an employee and told him "don't touch me," exchanged some cursing, threatened to call the manager, and reportedly tried to call the police. (Ekpenyong Aff., ¶ 11; Ekpenyong Dep., at 99-109 & 133-35.)  *The employee apparently confronted the customer, who became irate, but no other customer was involved, and apparently no report police report is available.* |
| (day not available)<br>Later in 2009<br>(time not available) | **Two intoxicated men got into a fight** near the rest room, "shoving and swinging a little bit," after which one of the men fled from the restaurant.  (Ekpenyong Aff., ¶¶ 8 & 9; Ekpenyong Dep., at 84-88 & 108.)   *No video is available, and apparently no police report is available.* |
| (day not available)<br>Later in 2009<br>(time not available) | **Two intoxicated men were "fighting** over a woman near the doors of the restaurant," the fight involved shoving and swinging, there was shouting and cursing, and the girl was trying to break up the fight, which ended after a customer shouted that they were calling the police. (Ekpenyong Aff., ¶¶ 8 & 10; Ekpenyong Dep., at 90-95 & 108.)  *This is apparently another No video is available, and apparently no police report is available.* |
| *Tuesday afternoon*<br>Nov. 10, 2009<br>(*3:57 p.m.*) | 30-to-35-year-old black male suspect walked up to 32-year-old white customer in line, punched him in the eye, and ran out of the restaurant. (*See* Webb Dep., at 104, & Ex. 6 thereto.)  *There was no warning of the attack, and no report of intoxication being a substantial factor.* |
| **Early Sunday morning**<br>Aug. 29, 2010<br>(**3:10 a.m.**) | 36-year-old **intoxicated** black male customer, irate about slow service, *knocked over and damaged change machine* on service counter. (*See* Webb Dep., at 105, & Ex. 7 thereto.)  *There was no warning of the attack, and no other customer and no potential deadly force involved.* |
| *Late Friday afternoon*<br>Jan. 28, 2011 | After having been barred from the restaurant by the restaurant's manager at *3:05 p.m.* on Aug. 28, 2010, and therefore was told to |

7

*(6:30 p.m.)*   leave by another employee on Jan. 28, 2011, 64-year-old black male *suspect threw cash and coins in that employee's face*, then went to China Café next door, which had also previously barred him, where employees called police.  When police arrived, suspect pulled fire alarm. (*See* Webb Dep., at 106, & Ex. 8 thereto.)  *There was no warning, no other customer or potential deadly force involved, and there was no warning of the attack, and no report of intoxication as significant factor.*

**Early Saturday morning**   One of two 20-to-25-year-old white male suspects **verbally**
Mar. 19, 2011   **abused,** threw fries at, **and pushed 26-year-old white female**
**(1:20 a.m.)**   **customer** inside the **restaurant**.  When a 26-year-old white male customer intervened, *both suspects repeatedly punched him in restaurant*.  When first two female customers tried to intervene, *the suspects punched them too inside the restaurant.*  (*See* Webb Dep., at 107-08, & Ex. 9 thereto.)  *There was no warning of the attack, and no report of intoxication as significant factor.*

*Early Thursday morning*   Four 17-to-20-year-old black male suspects *outside restaurant*
June 16, 2011   sprayed mace in 21-year-old *female pedestrian's* face, punched
*(1:32 a.m.)*   and forced her to the ground, took her purse, ran away with witnesses in pursuit, *leading to confrontation many blocks away from the restaurant in which armed suspect pulled gun on chasing witnesses,* who waived to passing police officers, who chased suspects and effected arrest. (*See* Webb Dep., at 108-10, & Ex. 10 thereto.)  *At that time on Thursday morning, Defendant's restaurant would not have been open, as it is open late only Thursday, Friday and Saturday nights, and there is no report of intoxication being a significant factor.*

*Saturday afternoon*   After **arguing with one black male suspect inside restaurant,**
July 30, 2011   *50-year-old B male customer left restaurant without incident,*
*(2:15 p.m.)*   was followed by nine male 17-to-21-year-old black male customers, and one suspect pepper-sprayed customer before the suspects ran away. (*See* Webb Dep., at 110-11, & Ex. 11 thereto.)  *There was no warning of the attack, and there is no report of intoxication being a significant factor.*

Whether considered separately or as a group, these ten incidents do not present a single

precedent or pattern of precedent sufficient to constitute a "more heightened showing of

foreseeability" of a confrontation between two groups of intoxicated 25-to-35-year-old white

males leading to a violent punch and lethal fall to the pavement outside the restaurant in the early

morning hours of Friday, September 23, 2011:

- ***There was no significant temporal pattern of incidents.***  Five of the ten incidents occurred in the latter half of 2009, almost two years before the Casey incident; there was only one, minor incident in all of 2010; and only one of the four incidents in 2011 occurred during late night hours on days when the moving Defendant's restaurant was open.

- ***Only one, potentially similar prior incident since later 2009.***  The incident closest in date (March 2011), time of day (early morning after midnight), place (within the restaurant) and context (two 20-25-year-old white males harassing and then punching a group comprising one male and two females aged 26-27) to the Casey incident began with the male suspects teasing the female victims and escalated only their male companion intervened, but there is no report that either group was intoxicated.

- ***The four other incidents within a year of the Casey incident did not present relevant security concerns***.  Three of those incidents occurred during the day or on a weekday night when the restaurant was closed, and the fourth such incident merely involved property damage by an irately impatient customer, without confrontation with any other customer.

- ***Intoxication is not a dominant factor in prediction of incidents***.  Four of the five incidents in the latter half of 2009 involved intoxication, but there was only one incident in total during all of 2010, even though presumably just as many intoxicated customers came to the restaurant each month during 2009 and 2010.  Only one of the five incidents after 2009 reported intoxication as a significant factor, and that incident did not involve any confrontation between customers or resulting bodily injury.

- ***Most serious physical incidents were over in a matter of seconds***.  Of the four incidents – three in 2009 and one in 2011 – that involved potentially serious violence inside the restaurant, there was no warning that an attack or fight was imminent in three incidents, and thus not sufficient time to call police to come in time to prevent the violence, and in the one case where there arguably was time for intervention, the only violence until the last seconds of the incident was the female hitting the male with her purse or some

9

similar object.

The full factual basis for drawing these determinative differences between the prior incidents and the Casey incident is set forth next below.

### 2.    The Factual Record of the Casey Incident

The factual basis for the undisputed material facts set forth above consists of (a) the restaurant's time-recording videotape from the night of the incident, and the resulting time line based on deposition testimony identifying the various participants and confirming the nature of their videotaped actions, and (b) the deposition testimony of various eye-witnesses, most of whom gave the police sworn statements near the time of the incident and thereafter gave grand jury testimony during the criminal investigation, and certain deposition exhibits including the restaurant's videotape record of the incident.

### a.    The Videotape-Based Key-Event Time Line

The relevant evidence of the event includes a McDonald's security-camera video (**Ex. E hereto**),[1] the deposition testimony of various eye-witnesses, police reports made shortly after the event of key-witness interviews, and several affidavits of witnesses who have not been found since or deposed. There is only one videotape vantage point – from behind the restaurant serving counter – but the video is clear enough for the various witnesses and their companions to be identified, thus permitting the parties to assemble the following approximate time line regarding the physical locations and movements of the key witnesses, especially Patrick Casey and his two friends and Defendants Ward, Ruark and Giblin. The videotape occasionally shows personnel employed by Rhee's McDonald's behind the counter, including manager Martinez and an unidentified cashier.

---

[1] The videotape does not have a sound track, and there are certain gaps in the tape reportedly due to a bad electrical connection in the video equipment.

| _Video Time_ | _Video Event_ |
|---|---|
| 1:13:03 a.m. | Lindsey and Jun arrive and get in line |
| 1:14:30 | An unrelated group of three men arrive in line |
| 1:15:20 | An unrelated couple in dark clothes arrive in line |
| 1:15:50 | Ward, Ruark and Giblin arrive in line, behind the unrelated three men and unrelated couple in dark clothes |
| 1:20:50 | Lindsey leaves line for 20 seconds to check with Casey outside the restaurant |
| 1:22:07 | Patrick appears in corridor between front door and waits at back of food line next to Ward, Ruark and Giblin without interaction, he turns and walks toward front door and looks for open seats |
| 1:22:25 | Lindsey and Jun begin placing their order |
| 1:23:36 | Lindsey and Jun go back to partition to wait for their food, Lindsey waves to Patrick, Patrick joins them, and they converse in corner for several minutes, apparently unaware of Ward, Ruark and Giblin |
| 1:24:20 | Unrelated three men begin placing their order, while behind them Ward, Ruark and Giblin talk with couple in dark clothes |
| 1:26:58 | Couple in dark clothes begin placing their order |
| 1:27:05 | Ward and Giblin begin horsing around in line, with Casey and Jun back in the corner while Lindsey gets their food at the counter, while Ruark stands back 1:28:06 |
| 1:27:25 | Casey, Lindsey and Jun leave serving area and go to seats on right side beyond partition half way to front of restaurant |
| 1:28:06 | Ward and Giblin continue horsing around until they begin placing their order |
| 1:29:20 | Ward, Ruark and Giblin place their order |
| 1:35:34 | After waiting alone in the corner in front of the partition, Ward, Ruark and Giblin pick up their order |
| 1:35:24 | Ward, Ruark and Giblin begin leaving serving area and go to seats at front of restaurant |

11

| | |
|---|---|
| 1:41:29 | About six minutes later, after shifting several times in his seat during the last minute or two, looks to his left, in the direction of the Ward table. |
| 1:41:37 | About eight seconds later, Casey gets up and walks to where Ward, Ruark and Giblin are sitting |
| 1:41:43 | Ruark stands up in front of Casey, whose back is to the door, and thereafter there is arm movement consistent with verbal argument |
| 1:41:57 | Customers at the Murphy table just behind the partition to the service area turn and look toward the Ward table where Casey is standing |
| 1:42:22 | Lindsey gets up and joins Casey in front of the other group's table |
| 1:42:30-34 | Casey stands back even with aisle partition near door, while Lindsey goes to door and then comes back beckoning Casey |
| 1:42:43-56 | Giblin [in light yellow shirt] gets up and walks toward door, Casey pushes Giblin, Giblin brushes past Casey, |
| 1:42:48-52 | Following Lindsey, Casey and Giblin go off screen toward the door, followed by Ward and Ruark. |
| 1:43:04 | Clare Jun also exits towards door out of sight |
| 1:43:16 | Two or three men [Giblin, Ruark and maybe Ward] briefly reappear near the front of restaurant |
| 1:43:30 | Watching bystanders including GWU students get up to investigate. |

### b.    Summary of the Record Testimony

The Statement of Undisputed Material Facts and related time line above, as reflected in the restaurant's time-calibrated videotape, is fully corroborated by the following time-sequential summary of all the factual testimony and supporting exhibits:

(a)    David Lindsey (in black t-shirt with green Dead Mouse band logo) and Clare Jun (in pink shirt) arrive at the restaurant before other key persons, and it was already loud, rowdy and busy there because the nearby bars had just closed. (Lindsey Dep., at 52-53, 118 & 201-02; Guild Dep., at 72.) Everyone coming into the restaurant seemed intoxicated. (Guild Dep., at 71.)

(b)    Lindsey and Jun then waited in line to order food for about 9 minutes. (Lindsey Dep.,

at 54-55.)

(c)   Ward (in a gray t-shirt), Ruark (in a plaid shirt) and Giblin (in a yellow polo shirt) entered the restaurant shortly after Lindsey and Jun, who were about 8 or more people ahead of them in line to order food. (Ruark Dep., at 87-90; Giblin Dep., at 42-45 & 155.) It was still crowded and loud. (Ruark Dep., at 145; Ward Dep., at 189-90; Giblin Dep., at 156.)

(d)   Until after Lindsey and Jun had finished placing their order, Ward, Ruark and Giblin waited in line without any sign of notable physical activity. (*See* restaurant videotape and timeline, *supra*.)

(e)   Lindsey and Jun went to the corner in front of the partition to wait for their food. (*See id.*)

(f)   Patrick Casey entered the restaurant and joined Lindsey and Jun while they were waiting for their food. (Lindsey Dep. at 55, 62 & 120-21.) He was intoxicated, loud and boisterous with his group, but not doing anything else "out of the ordinary." (Murphy Dep., at 80-81.)

(g)   After getting their food, Lindsey, Jun and Casey took a table on the right-hand side of the center of the restaurant behind the partition of the restaurant's serving area. (Lindsey Dep., at 63-64 & 121-22.)

(h)   While still waiting in line to place their order after Lindsey and Jun had placed their order, Ward and Giblin began "horsing around" with each other, while Ruark looked on and at one point tried to get the other two to settle down. (Ruark Dep. at 57-58, 90-91, 131-33, 145-52 & 180-81 & 225-30; Giblin Dep., at 158-59 & 229-30; *see* Ward Dep., at 195-97.) At one point, two other patrons appear to be backing away from Ward and Giblin, but there was no confrontation and no one complained to the restaurant staff. (Ruark Dep., at 225-30.)

(i)   Ward and Giblin ceased tussling and settled down when they began to place their food order, and acted calmly thereafter until after they sat down to eat at the front of the restaurant a few tables away from Casey, Lindsey and Jun. (*See* restaurant videotape and timeline, *supra*.)

(j)   Ward, Ruark and Giblin ordered their food, waited in the same corner where Lindsey and Jun had previously waited, picked up their food, and proceeded to the front of the restaurant to eat their food without further incident. (Ruark Dep. at 60, 65 & 153-54; Ward Dep., at198-200 & 203; Giblin Dep., at 47-48 & 160-61.)

(k)   The Casey group and the Ward group had no apparent contact with or recognition of each other until after the Ward group sat down to eat their food at the front of the restaurant. (Lindsey Dep., at 84-85 & 194; Ruark Dep. at 71; Ward Dep., at 265; Giblin Dep., at 45 & 51-52.)

(l)   When Casey first came to sit down with his group, Ruark was looking in Casey's

13

direction and said to Ward and Ruark that "that guy looks like Zangief," which is a character from the Street Fighter video game. (Ward Dep., at 204-05.) Ward's group went back to eating their food. (*Id.* at 205-096.)

(m)   At some point, Lindsey and Casey begin exchanging "trash talk" or other banter with Ward and Giblin about sports, physical prowess, or other "male" topics (Ruark Dep., at 66-68 & 70; *see* Ward Dep., at 207-09; *see* Guild Dep., at 34-35), raising their voices to be heard over the other noise in the restaurant. (Ruark Dep., at 68-69; *see* Murphy Dep., at 34-39.)

(n)   During that banter, which lasted one or two minutes (*see* Ruark Dep., at 70-71, 154-55 & 156-57; Ward Dep., at 206 & 266; Murphy Dep., at 41), someone from the Ward/Ruark/Giblin group makes a provocative remark, reportedly about Casey's hairline. (Lindsey Dep., at 203-05; *see* Murphy Dep., at 82.) Casey did not appear to be offended and treated it jokingly in his response. (*Id.*) A nearby student testified that unfriendly remarks were being exchanged between the two groups, and that the situation was getting verbally provocative, but not disorderly. (Murphy Dep., at 38-39 & 88-89; Rosenzweig Dep., at 113-14.)

(o)   Casey then swivels left in his seat and gets up to walk over to where Ward (opposite Casey's chair), Ruark (back to Casey's chair) and Giblin are sitting, and as Casey approaches Ruark gets up and turns around so he could see Casey and puts his hands out in Casey's direction. (Ruark Dep., at 74, 92 & 161; Giblin Dep. at 61-62.)

(p)   At about 1:41:34 on the restaurant videotape, Casey is standing in front of Ward, Ruark and Giblin; at about 1:41:40 Lindsey joins Casey (Lindsey Dep., at 122-23; Ruark Dep., at 70-72 & 77), and makes a remark to Ward, Ruark and Giblin about having lost his hair because he had served in the Army in the Middle East, at about that point in time, at which time the mood appeared jovial and not confrontational to Lindsey, Ruark and Ward (Lindsey Dep., at 66-67, 69 & 124; Ruark Dep., at 75-76), but seemed confrontational to Giblin. (Giblin Dep., at 69, 71 & 106; *see* Rosenzweig Dep., at 32, 34, 35-36, 59-60 & 67-68.) At that point, Casey was not shouting and had not pushed anyone (Lindsey Dep., at 206-07; Giblin Dep., at 164 & 167-68), but said something that provoked further argument. (*See* Murphy Dep., at 122.)

(q)   Specifically, after finishing his food, Lindsey gets up and joins Casey in front of the other group's table at about 1:42:21-24 on the videotape (Lindsey Dep., at 124-25, 173-74 & 205-06; Ruark Dep., at 93 & 161-63; Giblin Dep. at 66) where the other group "were needling Casey about losing his hair" as "trash talk" or "guys making fun of each other in the bar after the night," and Lindsey asked Casey to stop the conversation. (Lindsey Dep., at 129-30, 186-87 & 190-92.)

(r)   Then, before backing away to leave the restaurant with Casey at around 1:42:34 (Lindsey Dep. at 126-27 & 129), Lindsey said something to Ward, Ruark and Giblin like "have fun going home together," to which one of the other three responded "what are you calling us fags," to which Lindsey replied "well what are you doing?" (Lindsey Dep., at 68-69 & 206; Ruark Dep., at 77-78 & 163-64; Ward Dep., at 267;

*see* Giblin Dep., at 57-60, 66-67, 70 & 227-28 (attributing initial gay-slur remarks to Casey, then repeated by Lindsey).)

(s)   Giblin "appeared pissed" at Lindsey's remark, "jumped up" and "put his hands on" Lindsey's "shoulders." (Lindsey Dep., at 70-71 & 207-10; Murphy Dep., at 49-50 & 93-94; *see* Guild Dep., at 57-58; Rosenzweig Dep., at 35 & 69-70.) This was the first physical contact between the two groups, the situation was not jovial any more, and Lindsey in a rising voice said he was leaving and asked Casey to leave. (Lindsey Dep., at 210-11.) All this had occurred less than a minute after Casey approached the Ward group's table. (Murphy Dep., at 46 & 50.)

(t)   Ruark testified he had a gay brother and was sensitive to such remarks (Ruark Dep., at 77), and Lindsey's gay-slur remark caused the dispute to escalate to physical contact including pushing and shoving. (Ruark Dep., at 248-49; *see* Giblin Dep., at 80 & 86-87; *See* Rosenzweig Dep., at 71.)

(u)   Lindsey and then Casey backed up towards the door, assertedly "trying to de-escalate the situation." (Lindsey Dep., at 71; *see* Murphy Dep., at 50-52.) Lindsey testified that "the [other] guy was still on me" – "had his hands on me" while Lindsey said "we're leaving." (Lindsey Dep., at 72, 73 & 135; Ruark Dep., at 78-79 & 93.) The restaurant videotape shows that "the guy" had let go of Lindsey by the time he passed Casey on the way to the door, but Lindsey testified that some guy put hands on him again at the door and prevented him from leaving the restaurant. (Lindsey Dep., at 130-34, 145-46 & 214-16.)

(v)   Meanwhile, Casey too backs up towards the door, says "my friend [Lindsey] is going to leave," and invites the other group to go out for a fight, stating that "I'll beat all three of your asses" (Ruark Dep., at 73, 78 & 258-59; *see* Giblin Dep., at 121-22 & 227-28; *see* Murphy Dep., at 55 & 124-25), to which Ward responded with "pf, come on, man." (Ward Dep., at 212-13, 254-57 & 279; Ruark Dep., at 112.) Ruark thus regarded Casey as the verbal aggressor in the situation (Ruark Dep., at 268 & 276-77; *see* Murphy Dep., at 128; Rosenzweig Dep.; at 39), but Lindsey's gay-slur remark provoked Giblin to be aggressive as well. (Ruark Dep., at 248-49.)

(w)   As his group was getting up to leave (*see* Giblin Dep., at 72 & 74-75), in an effort to defuse the situation, Ruark made a remark to Casey, about being a big man, jokingly referring to the video game character "Zangief," in response to which Casey smiled, but continued to stare at Ward and Giblin. (Ruark Dep., at 74-77, 83, 157-59 & 252.)

(x)   Giblin started to leave, but Casey blocked his way, grabbed his arm, and pushed him back momentarily towards a trash receptacle. (Giblin Dep., at 73-74, 78-97 & 102-03; Giblin Dep., at 107 & 179-80; Murphy Dep., at 52-53 & 119; Rosenzweig Dep., at 36.) No one from Giblin's group did anything to prevent Casey from leaving. (Giblin Dep., at 231-33.)

(y)   The door of the restaurant is not visible on the videotape, but Giblin and Ward testified they were just trying to leave to avoid a fight, but Casey and Lindsey were

15

blocking the door, and Giblin shouted something like "get the hell out of my way." (Giblin Dep., at 72, 78-83, 181-82 & 186; *see* Ruark Dep., at 100-101.)  Ruark tried to stay between his friends and Lindsey and Casey, but did not follow the other four out the door.  (Ruark Dep., at 79-80, 96, 135, 168-69, 181-82 & 184-85.)

(z)  Giblin was the first one to follow Lindsey past Casey towards the door, followed in turn by Casey and then Ward.  (Ruark Dep., at 78-79, 80-81, 93-95, 165-67 & 245-46; Ward Dep., at 211-12 & 268; *see* Murphy Dep., at 45.)

(aa)  There was some pushing and shoving inside the door, no punches were thrown and no one was hurt inside the restaurant, but in effect both groups voluntarily left through the restaurant's front door.  (Lindsey Dep., at 74; Ward Dep. at 213, 223-24, 268-69 & 281-82; Ruark Dep., at 78, 80, 85-86, 111-12, 169-73, 187, 260, 271-74; Guild Dep., at 85; Rosenzweig Dep., at 41-42, 60-61, 112-13 & 131-33.)  The public sidewalk pavement on M Street was immediately outside the restaurant.  (Lindsey Dep., at 74-75.)

(bb)  As Lindsey and Casey facing Giblin and then Ward exited the restaurant and reached the M Street pavement, in that order and close to each other, the situation "escalated" to violent contact.  (Lindsey Dep., at 75-76 &126-28; Ruark Dep. at 78-79, 80-81, 175-76, 177-78 & 184; Giblin Dep., at 86-87 & 193; *see* Ward Dep., at 211 & 282.)

(cc)  Lindsey went first through the restaurant's front door, turned left, walked several paces towards 19th Street, and turned around to see the back of Casey in front of the door facing the same direction towards 18th Street.  (Lindsey Dep., at 75-79.)  Lindsey continued making crude remarks as he exited the restaurant and began walking away (Ward Dep., at 275-76 & 283-84; *see id.* at 283-88.)

(dd)  As they slid through the restaurant doors onto the sidewalk, Casey grabbed Giblin (in a yellow shirt) by the upper body, spun him around in a circle and threw or pushed him to the right of the door.  (Ward Dep., at 222-24 & 269-70; Ruark Dep., at 208; Giblin Dep., at 89-95, 123, 194-96 & 234; *see* Murphy Dep., at 56-59 & 103; Guild Dep., at 43-45; Rosenzweig Dep., at42-43.)  There is no evidence that Giblin struck Casey first.  (*See id.*)

(ee)  Other than the observed pushing and shoving inside the restaurant door, there is no evidence that Giblin or Ward harmed Casey or Lindsey in any way before Casey grabbed and pushed or spun Giblin around outside the restaurant on the public sidewalk.  (Ward Dep., at 271 & 273; Giblin Dep., at 199-200; *see* Murphy Dep., at 66-67; Rosenzweig Dep., at 112-13; Podlone Aff., ¶ 8.)

(ff)  Upon turning around, Lindsey saw one of the other group came out the restaurant door "after Casey," and Lindsey saw that person (Ward) cock his fist and "sucker punch" Casey, who then fell backwards towards the pavement and hit the back of his head on the cement.  (Lindsey Dep., at 80-81, 90-91 & 99-100; Ruark Dep., at 114-15, 116, 203 & 209.)  Once Lindsey realized that Casey was unconscious and not breathing, he called 911 on his cell phone.  (Lindsey Dep., at 86; *see* Murphy Dep., at 60-61; Guild

16

Dep., at 43-45.)

(gg) Ward said that he approached and "sucker" punched Casey to protect Giblin and himself, while Casey was spinning Giblin around in the air.  (Ward Dep., at 222-25, 227-30, 236 & 250-51, 256-57, 272 & 278; Ruark Dep., at 247; *see* Podlone Aff., ¶ 9-10.)  After that blow, Giblin fell to the ground, picked himself up, and told Ward "we've got to go."  (Ward Dep., at 232 & 257.)  There is no evidence that Ward would have attached Casey if Casey had not picked up and thrown Giblin.  (*Id.* at 275 & 280-81.)

(hh) (ii) After telling Ruark "we got to go" inside the restaurant only 20-30 seconds after first exiting, Ward and Ruark followed Giblin in leaving the scene without rendering any assistance to Casey, while Lindsey was calling 911.  (Ward Dep., at 233, 258-59 & 272; Ruark Dep., at 99-100, 101, 138-39, 188, 190-91, 195-200 & 251-52; Lindsey Dep., at 223-24.)

(ii) Before the last **75 seconds** inside the restaurant after Patrick Casey stood up to approach the Ward/ Ruark/Giblin table, no one in either group felt afraid for their safety.  (Lindsey Dep., at 53; Ward Dep., at 274-75 & 282-83; Ruark Dep., at 242-44 & 270; Giblin Dep., at 237-38.)  The whole thing from the pushing and shoving at the door to the grabbing and punching outside the restaurant was "like **20 seconds**," and most of those 20 seconds took place within the last 75 seconds inside the restaurant.  (Ward Dep., at 235; *see* Giblin Dep. at 104-05.)

(jj) As Casey, Lindsey, Giblin and Ward pushed and shoved at the door, an American University law student in the restaurant near the door "stood up to make and attempt to break up" what he thought was an "impending attack" and ran to the doorway, saw Casey and Giblin "grappling and yelling," saw Ward cock his arm to punch Casey, "moved to grab" Ward "to prevent him from throwing the punch, but was unable to do so," and saw Ward "sucker punch" Casey while he was looking in Giblin's direction."  (Podlone Aff., ¶¶ 6-10.)

(kk) No one else in the restaurant felt afraid for their own safety at any time.  (Murphy Dep., at 125-26; Rosenzweig Dep., at 107-08; Guild Dep., at 87; *also see* Martinez Aff., *passim*.)

(ll) Casey was about 6 feet 4 inches tall and weighed between 250 and 300 pounds, and Lindsey was 6 feet 2 inches tall and weighed about 201 pounds.  (Lindsey Dep., at 158-59; Giblin Dep., at 39-40.)

(mm) Ward was about 5 feet 10 inches tall and weighed about 200 pounds, Ruark was about 6 feet tall and weighed about 215-20 pounds, and Giblin was about 6 feet 2 inches tall and weighed about 190 pounds.  (Ruark Dep., at 193-94 & 240-41; Ward Dep., at 82 & 223; Giblin Dep., at 38-39.)

(nn) There were four restaurant employees behind the service counter and none in the front of the restaurant.  (*See* Lindsey Dep., at 217-18; Santos Dep., at 20.)  The manager heard shouting just before the Casey group and the Ward group left the restaurant, but

apparently not before. (Martinez Aff., at 7-8.) Sonia Santos and Francisca Lainez did not hear any argument or fighting during the Casey incident from their position in the food preparation area behind the serving area. (Santos Dep., at 47-49; Lainez Dep., at 53-54 & 58.)

(oo) Patrick Casey was legally intoxicated, with a post-incident ETOH of [0.]199 percent blood alcohol (**Ex. F hereto**, Neurosurgery Consultation form.) Before he approached the Ward group's table, Casey was observed as being intoxicated, loud and "messing around" with his group by other patrons in the restaurant, but he was not unruly. (Murphy Dep., at 30-33; Rosenzweig Dep., at 23-24.)

(pp) David Lindsey was intoxicated and regarded himself as "drunk" at the time he entered the restaurant (Lindsey Dep., at 51.) David Lindsey had texted Mr. Casey before they met at the McDonald's restaurant that he was "raging on E" referring to the drug Ecstasy. (*See* Lindsey Dep., at 45 & 161.)

(qq) Jason Ward (Ward Dep., at 112-14, & Ex. 10 thereto), Justin Ruark (Ruark Dep., at 136), and Brian Giblin (Giblin Dep., at 25-26, 37 & 137-49) had been drinking and appeared intoxicated while they were in the restaurant. (*See* Guild Dep., at 70.) Ruark regarded himself as "drunk" or "over the legal limit" when they entered the McDonald's restaurant. (Ruark Dep., at 136.)

(rr) The restaurant owner's policy was that personnel were not to intervene in patron fights, but instead if there is a fight to call police and await help. (Fuentes Dep., at 29 & 53; Santos Dep., at 29-30; Lainez Dep., at 37.) In the event of patron arguments or other non-physical disturbances, the restaurant owner's policy was to ask the patrons to stop, ask them to leave if they don't stop, and call the police via 911 if they don't leave. (Rhee Dep., at 122; Liu Dep., at 35-38; Fuentes Dep., at 18.) This restaurant has never had a security guard. (*See* Fuentes Dep., at 24-25; Santos Dep., at 38; Lainez Dep., at 46.)

(ss) The restaurant has several security video cameras, including the one pointed toward the front by which the videotape of this incident was taken, but the staff do not monitor the camera output. (Santos Dep., at 32-33.)

(tt) A police officer was on the scene about 73 seconds after the first 911 call was received. (**Ex. G hereto**, Police Event Chronology, PL03995.)

*          *          *

Dated this 3rd day of February 2016.

18

Respectfully submitted,

BONNER KIERNAN TREBACH & CROCIATA, LLP

/s/ Michael L. Pivor

Joseph J. Bottiglieri, Esquire #418523
Michael L. Pivor, Esquire #500911
1233 20th Street, N.W.
Suite 800
Washington, D.C. 20036
(202) 712-7000
(202) 712-7100 Fax
jbottiglieri@bonnerkiernan.com
mpivor@bonnerkiernan.com
*Counsel for Defendant Kyung Rhee*
*d/b/a Rhee's McDonalds*

19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                               |     |                         |
|-------------------------------|-----|-------------------------|
| **PAUL D. CASEY, et al.**     | )   |                         |
|                               | )   |                         |
| **Plaintiff,**                | )   |                         |
|                               | )   | **Case No. 1:13-cv-1452** |
| **v.**                        | )   |                         |
|                               | )   |                         |
| **JASON WARD, et al.,**       | )   |                         |
|                               | )   |                         |
| **Defendants.**               | )   |                         |

_____)

**DEFENDANT KYUNG RHEE d/b/a RHEE'S McDONALD'S**
**SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
**OF ITS REPLY TO PLAINTIFFS' OPPOSITION TO THIS DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Kyung Rhee d/b/a Rhee's McDonald's (hereinafter "Defendant Rhee's McDonald's"), by and through counsel, BONNER KIERNAN TREBACH & CROCIATA, LLP, pursuant to Fed. R. Civ. Proc. 56 and respectfully submits this Supplemental Statement of Undisputed Material Facts in support of its Reply to Plaintiffs' Consolidated Opposition to Defendant's Rhee's McDonald's pending motion for summary judgment on remaining counts of the Amended Complaint against it.

The sole purpose of this Supplemental Statement of Undisputed Material Facts is to expand and update Section B.1 – from pages 6-10 of this Defendant's original Statement of Undisputed Material Facts – to add to Defendants' chronological table of incidents the nine additional prior violent incidents which Plaintiff alleges is relevant and, for those nine added incidents, to submit distinguishing facts and other supporting discussion like that provided in Defendant's original Statement, as follows:

During discovery, Plaintiffs' counsel presented police reports and elicited testimony

regarding six diverse incidents that occurred in or near Defendant Rhee's McDonald's restaurant during the preceding 26 months, and presented an affidavit regarding four other diverse incidents in the latter part of 2009.   Those 10 incidents were summarized in Defendant Rhee's MeDonald's SOMF (at 6), to which the nine (9) additional incidents listed in Plaintiffs' Opposition (at 12-13) have been added below solely for completeness, all with the few arguable similarities highlighted in **boldface** and the most significant differences highlighted in ***bold italics***.

| Date/Time | Location and Nature of Incident |
|---|---|
| **Early Sunday Morning** August 16, 2009 (**2:00 a.m.**) | After "a couple of minutes" of shouting and cursing between a black male and black female who were **intoxicated**, the woman repeatedly hit the man, and then, "[w]hen the man walked around the corner before he exited the McDonald's, ***he took it . . . his right hand, and placed it around the woman's neck, and threw her to the ground,***" and then left the restaurant, after which the woman picked herself up and followed the man out of the restaurant. (Ekpenyong Dep., at 50-51 & 131-33, & Ex. 1 thereto, Ekpenyong Aff., ¶¶ 2-7.)   According to the witness, someone from the restaurant called the police.  (Ekpenyong Dep., at 69-71.)  ***This is apparently a "domestic" dispute, with no other customers physically involved, and the choke-slam occurred just seconds before the man exited and the woman exited immediately afterward.*** |
| **Early Sunday Morning** October 25, 2009 (4:00 a.m.) | While the restaurant had few customers and was relatively quiet, an **intoxicated** customer had a mild verbal exchange with an employee and told him "don't touch me," exchanged some cursing, threatened to call the manager, and reportedly tried to call the police.  (Ekpenyong Aff., ¶ 11; Ekpenyong Dep., at 99-109 & 133-35.)  ***The employee apparently confronted the customer, who became irate, but no other customer was involved, and apparently no police report is available.*** |
| (date not available) Later in 2009 (time not available) | **Two intoxicated men got into a fight** near the rest room, "shoving and swinging a little bit," after which one of the men fled from the restaurant.  (Ekpenyong Aff., ¶¶ 8 & 9; Ekpenyong Dep., at 84-88 & 108.)   ***No video is available, and apparently no police report is available.*** |

| | |
|---|---|
| (day not available)<br>Later in 2009<br>(time not available) | **Two intoxicated men were "fighting** over a woman near the doors of the restaurant," the fight involved shoving and swinging, there was shouting and cursing, and the girl was trying to break up the fight, which ended after a customer shouted that they were calling the police. (Ekpenyong Aff., ¶¶ 8 & 10; Ekpenyong Dep., at 90-95 & 108.) *No video is available, and apparently no police report is available.* |
| ***Tuesday afternoon***<br>Nov. 10, 2009<br>(***3:57 p.m.***) | 30-to-35-year-old black male suspect walked up to 32-year-old white customer in line, punched him in the eye, and ran out of the restaurant. (*See* Webb Dep., at 104, & Ex. 6 thereto.) *There was no warning of the attack, so any security guard could not have intervened, and no report of intoxication being a substantial factor.* |
| **Sunday morning**<br>Jan. 24, 2010<br>(time unknown) | *In bar next door to McDonald's*, undescribed male [?] *groped victim's girlfriend*, *then head-butted male victim*, causing undescribed injuries. (*See* Opposition, at 12-13.) *There is no connection with the restaurant, and in any event apparently no warning, so any security guard could not have intervened, and no report of intoxication being a substantial factor.* |
| **Early Saturday morning**<br>**July 17, 2010**<br>(2:02 a.m.) | Male assailant cut in front of 25-year-old white male in line for food, provoking verbal altercation after which assailant punched victim in nose and fled. (*See* Opposition, at 12-13.) *There was no warning of attack, and no report of intoxication being a substantial factor.* |
| *Early Monday morning*<br>May 24, 2010 | *On sidewalk one block away from restaurant*, unknown assailants hit victim with blunt object, leaving him bleeding (2:40 a.m.) on sidewalk with broken jaw. (*See* Opposition, at 12-13.) *There is no connection with the restaurant. The restaurant would have been closed at this time. Victim was intoxicated, but no Report of intoxication being substantial factor in assailant's conduct.* |
| **Early Sunday morning**<br>Aug. 29, 2010<br>(**3:10 a.m.**) | 36-year-old **intoxicated** black male customer, irate about slow service, *knocked over and damaged change machine* on service counter. (*See* Webb Dep., at 105, & Ex. 7 thereto.) *There was no warning of the attack, no person was struck or injured, and no other customer and no potential deadly force involved.* |
| **Sunday morning**<br>Oct. 17, 2010<br>(time unknown) | *In front of* restaurant, four [unidentified] *assailants* approached three [unidentified] victims and *asked them for money*. *Assailants* then *attacked*, using some outside table and punches to head and |

neck.  (*See* Opposition, at 12-13.)  ***There is no connection with the restaurant, which would not have had any warning, so any inside security guard could not have intervened, and no report of intoxication being a substantial factor.***

| | |
|---|---|
| **Early Saturday morning**<br>**Nov. 11, 2010** | ***Female accidentally*** pushed restaurant front door with too much force, ***broke door hinge***, and fled.   (*See* Opposition, at 12-13.)  ***Nothing reportedly occurred before this "accident," and there is nothing security-related about this incident.*** |
| ***Late Friday afternoon***<br>Jan. 28, 2011<br>(***6:30 p.m.***) | After having been barred from the restaurant by the restaurant's manager at ***3:05 p.m.*** on Aug. 28, 2010, and therefore was told to leave by another employee on Jan. 28, 2011, 64-year-old black male ***suspect threw cash and coins in that employee's face***, then went to China Café next door, which had also previously barred him, where employees called police.  When police arrived, suspect pulled fire alarm. (*See* Webb Dep., at 106, & Ex. 8 thereto.)  ***There was no warning, no person was struck or injured, no other customer or potential deadly force involved, and there was no warning of the attack, and no report of intoxication as significant factor.*** |
| **Sunday morning**<br>Feb. 6, 2011<br>(time unknown) | ***Unidentified assailant at Rumors bar, half a block from restaurant,*** struck customer with beer bottle, and struck customer's friend in the face with unknown object.  (*See* Opposition, at 12-13.)  ***There is no connection with the restaurant, as this occurred at another establishment, and no report of intoxication being a substantial factor.*** |
| ***Saturday morning***<br>Feb. 19, 2011<br>(***8:50 a.m.***) | 35-year-old Hispanic male, who had been served Barring Notice by the restaurant four days earlier, returned to the restaurant and refused to leave.  Police were called and apparently removed him.  (*See* Opposition, at 12-13.)  ***There was no person struck or injured, no other customer or potentially deadly force involved, and no report of intoxication as a factor.*** |
| **Early Saturday morning**<br>Mar. 19, 2011<br>(**1:20 a.m.**) | One of two 20-to-25-year-old white male suspects **verbally abused,** threw fries at, **and pushed 26-year-old white female customer** inside the **restaurant**.  When a 26-year-old white male customer intervened, ***both suspects repeatedly punched him in restaurant***.  When first two female customers tried to intervene, ***the suspects punched them too inside the restaurant***.  (*See* Webb Dep., at 107-08, & Ex. 9 thereto.)  ***There was no warning of the attack, and no report of intoxication as significant factor.*** |
| ***Early Thursday morning*** | Four 17-to-20-year-old black male suspects ***outside restaurant*** |

| June 16, 2011 (***1:32 a.m.***) | sprayed mace in 21-year-old ***female pedestrian's*** face, punched and forced her to the ground, took her purse, ran away with witnesses in pursuit, ***leading to confrontation many blocks away from the restaurant in which armed suspect pulled gun on chasing witnesses***, who waived to passing police officers, who chased suspects and effected arrest. (*See* Webb Dep., at 108-10, & Ex. 10 thereto.) ***There is no connection to the restaurant. At that time on Thursday morning, Defendant's restaurant would not have been open, as it is open late only Thursday, Friday and Saturday nights, and there is no report of intoxication being a significant factor.*** |
| **Sunday morning** July 17, 2011 (time unknown) | ***"Large" street fight occurred at corner of 19th & M Streets, half a block away, NOT "just outside McDonald's."*** (*See* Opposition, at 12-13.) ***There is no is no connection with the restaurant, which would not have had any warning, so any inside security guard could not have intervened, and no report of intoxication being a substantial factor.*** |
| ***Saturday afternoon*** July 30, 2011 (***2:15 p.m.***) | **After arguing with one black male suspect inside restaurant**, ***50-year-old black male customer left restaurant without incident***, was followed by nine 17-to-21-year-old black male customers, and one suspect pepper-sprayed customer before the suspects ran away. (*See* Webb Dep., at 110-11, & Ex. 11 thereto.) ***There was no warning of the attack, and there is no report of intoxication being a significant factor.*** |
| **Sunday morning** Sept. 4, 2011 (time unknown) | ***Unidentified customer at Camelot Bar assaulted two individuals as he was leaving***, and ***ripped the stair railing off the wall***. (*See* Opposition, at 12-13.) ***There is no connection with the restaurant, which would not have had any warning, and no report of intoxication being a substantial factor.*** |

Whether considered separately or as a group, the original ten incidents do not present a single precedent or pattern of precedent sufficient to constitute a "more heightened showing of foreseeability" of a confrontation between two groups of intoxicated 25-to-35-year-old white males leading to a violent punch and lethal fall to the pavement outside the restaurant in the early morning hours of Friday, September 23, 2011:

- ***There was no significant temporal pattern of incidents.***  Five of the ten incidents occurred in the latter half of 2009, almost two years before the Casey incident; there was

only one, minor incident in all of 2010; and only one of the four incidents in 2011 occurred during late night hours on days when this Defendant's restaurant was open.

- ***Only one, potentially similar prior incident since later 2009.***  The incident closest in date (March 2011), time of day (early morning after midnight), place (within the restaurant) and context (two 20-25-year-old white males harassing and then punching a group comprising one male and two females aged 26-27) to the Casey incident began with the male suspects teasing the female victims and escalated only when their male companion intervened, but there is no report that either group was intoxicated.

- ***The four other incidents within a year of the Casey incident did not present relevant security concerns***.  Three of those incidents occurred during the day or on a weekday night when the restaurant was closed, and the fourth incident merely involved property damage by an irately impatient customer, without confrontation with any other customer.

- ***Intoxication is not a dominant factor in prediction of incidents***.  Four of the five incidents in the latter half of 2009 allegedly involved intoxication, but there was only one incident in total during all of 2010, even though presumably just as many intoxicated customers came to the restaurant each month during 2009 and 2010.  Only one of the five incidents after 2009 reported intoxication as a significant factor, and that incident did not involve any confrontation between customers or resulting bodily injury.

- ***Most serious physical incidents were over in a matter of seconds***.  Of the four incidents – three in 2009 and one in 2011 – that involved potentially serious violence inside the restaurant, there was no warning that an attack or fight was imminent in three incidents, and thus not sufficient time to call police to come in time to prevent the violence, and in the one case where there arguably was time for intervention, the only violence until the last seconds of the incident was the female hitting the male with her purse or some similar object.

The added nine incidents from Plaintiffs' Opposition (at 12-13) are of little or no relevance, for the following principal reasons:

- ***Most of the incidents did not occur within or originate in the restaurant***. Of the nine added incidents from Plaintiffs' Opposition, three (3) – harassment or other random

assaults – occurred in nearby bars serving alcohol (Rumors, Camelot, and one next door), not in this Defendant's restaurant which does not serve alcohol; two (2) – a street fight and a mugging – occurred down the street, without any connection to this Defendant's restaurant; and one (1) – a mugging-robbery, occurred in front of the restaurant, but without any connection to the restaurant.

- ***The Remaining Incidents Were Not Multi-Group Fights***.   Of the remaining three incidents from Plaintiffs' Opposition, one involved a punch in the nose after a butting-in-line argument between two single patrons; one involved a non-violent customer who refused to leave after having been given a formal Barring Notice four days earlier; and one involved a non-violent female patron who <u>accidentally</u> damaged the restaurant's front door.

The most likely reason for Plaintiffs' Opposition to include these nine incidents would have been to create a false appearance of more frequent incidents during 2010 (by adding five incidents) and the first three quarters of 2011 (by adding four incidents), when in fact there were very few potentially relevant incidents during those 21 months.

The full factual basis for drawing these determinative differences between the prior incidents and the Casey incident is set forth in Sections A and B.2 of Defendant's original Statement.